## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TSAWD Holdings, Inc., *et al.*,[1] | Case No. 16-10527 (MFW) |
| Debtors. | |
| O2COOL, LLC, | |
| Plaintiff, | |
| v. | |
| TSA STORES, INC.; BANK OF AMERICA, N.A.; WELLS FARGO BANK, NATIONAL ASSOCIATION; WILMINGTON SAVINGS FUND SOCIETY, FSB; YUSEN LOGISTICS (AMERICAS) INC.; and OOCL (USA), INC., | Adv. Proc. No. 16-51014 (MFW) |
| Defendants. | |

## JOINT MOTION FOR SUMMARY JUDGMENT
## BY TSA STORES, INC. AND YUSEN LOGISTICS (AMERICAS) INC.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  TSAWD Holdings, Inc. (9008); Slap Shot Holdings Corp. (8209); TSAWD, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).  The headquarters for the above-captioned Debtors is located at 2305 East Arapahoe Road, Suite 234, Centennial, Colorado 80122.

The Debtors were formerly known as:  Sports Authority Holdings, Inc. (9008); Slap Shot Holdings Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).

# TABLE OF CONTENTS

**Page**

I.  SUMMARY OF THE ARGUMENT ............................................................ 1

II.  LEGAL STANDARD FOR SUMMARY JUDGMENT.................................. 2

III.  UNDISPUTED FACTS ......................................................................... 4

    A.  Sale of the Sold Goods by the Plaintiff to TSA ...................................... 4

    B.  Transportation of the Sold Goods to the Distribution Centers .............................. 5

        1.  Yusen's Role in the Transportation of the Sold Goods ............................. 5

        2.  Role of Yusen's Affiliates in the Transportation of the Sold Goods.......... 6

        3.  Delivery of the Sold Goods to Shenzhen.................................................. 6

        4.  Delivery of the Sold Goods to the Transporting Carriers.......................... 7

        5.  OOCL's Role in the Transportation of the Sold Goods............................. 8

        6.  Role of Orient Overseas in the Transportation of the Sold Goods ............. 9

        7.  Role of Other Carriers in the Transportation of the Sold Goods ............... 9

        8.  Yusen's Role as Custom House Broker at U.S. Ports of Discharge ......... 10

    C.  Summary of the Shipment of the Sold Goods ....................................... 11

    D.  Delivery of the Sold Goods to TSA..................................................... 11

    E.  The Plaintiff's Ineffective Stop Shipment Notices to Yusen................................ 11

    F.  The Plaintiff's Ineffective Stop Shipment Notices to OOCL ............................. 12

    G.  The Plaintiff's Failure to Send Stop Shipment Notices to YL Hong Kong, Shenzhen, and the Transporting Carriers............................................... 13

    H.  The Plaintiff's Failure to Assert Any Reclamation Claims ................................. 13

    I.  The Plaintiff's Failure to Assert Any Administrative Expense Claims................ 13

IV.  ARGUMENT....................................................................................... 14

    A.  TSA Acquired Title in the Sold Goods Under Sections 2-401 and 2-319 of the UCC as a Matter of Law .................................................................. 14

## TABLE OF CONTENTS
### (cont'd)

B.    The Stop Shipment Notices Were Not Effective to Stop the Delivery of the Sold Goods Under Sections 2-702 and 2-705 of the UCC as a Matter of Law ............ 16

C.    The Plaintiff's Right to Stop Delivery of the Sold Goods Expired After the Sold Goods Were Delivered to TSA and the Plaintiff Did Not Pursue Any Reclamation Remedies After the Sold Goods Were Delivered to TSA..................................... 19

D.    The Defendants Are Entitled to Summary Judgment on Count I of the Complaint Because the Sold Goods Became Property of TSA's Estate and the Plaintiff Did Not Regain Title in the Sold Goods via the Stop Shipment Notices ................... 21

E.    The Defendants Are Entitled to Summary Judgment on Count II of the Complaint Because the Plaintiff Did Not Regain Any Rights in the Sold Goods via the Stop Shipment Notices That Are Superior to the Lenders' Rights in the Sold Goods . 23

F.    The Defendants Are Entitled to Summary Judgment on Count III of the Complaint Because the Plaintiff Did Not Regain Title to the Sold Goods via the Stop Shipment Notices Such That None of the Defendants Exercised Are Liable to the Plaintiff ...................................................................................................... 25

V.    CONCLUSION.............................................................................................................. 26

TSA Stores, Inc. ("TSA") and Yusen Logistics (Americas) Inc. ("Yusen" and together

with TSA, the "Movants"), by and through their undersigned counsel, hereby file this motion for

summary judgment (the "Motion") against O2Cool, LLC (the "Plaintiff") in connection with the

*Complaint* [Adv. Proc. D.I. 1] (the "Complaint") filed by the Plaintiff against (i) TSA,

(ii) Yusen, (iii) OOCL (USA), Inc. ("OOCL"), (iv) Bank of America, N.A. ("BofA"), (v) Wells

Fargo Bank, National Association ("Wells"), and (vi) Wilmington Savings Fund Society, FSB

("WSFS" and together with BofA and Wells, the "Lenders"; and collectively with the Movants,

OOCL, and the Lenders, the "Defendants"), pursuant to Rule 56 of the Federal Rules of Civil

Procedure (the "Federal Rules"), made applicable herein by Rule 7056 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), seeking an order finding against the Plaintiff

and in favor of all Defendants on Count I, Count II, and Count III of the Complaint.  In support

of the Motion, the Movants submit the *Declaration of Ronald M. Marotta* (the "Marotta

Declaration"), filed contemporaneously herewith.  In further support of the Motion, the Movants

respectfully state as follows:

## I.    SUMMARY OF THE ARGUMENT

1.    The Defendants are entitled to summary judgment against the Plaintiff because

the undisputed facts demonstrate each of the following:

(a)    TSA acquired rights and title to certain goods that it purchased and received from the Plaintiff (collectively, the "Sold Goods") before TSA filed its chapter 11 petition on March 2, 2016 (the "Petition Date").  The Sold Goods became property of TSA's estate.

(b)    The Plaintiff failed to send valid and effective stoppage notices, in accordance with Section 2-705 of the Uniform Commercial Code ("UCC"), for the purpose of stopping the delivery of the Sold Goods to TSA.

(c)    The Plaintiff did not pursue any reclamation claims against TSA, pursuant to Section 2-702 of the UCC or pursuant to section 546(c) of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>"), with respect to the Sold Goods.  Nor did the Plaintiff file any administrative expense claims pursuant to section 503(b)(9) of the Bankruptcy Code with respect to the Sold Goods.

(d)     TSA has since sold, and is no longer in possession of, the Sold Goods, such that the Plaintiff cannot at this late date revive its expired reclamation rights in the Sold Goods.

(e)     Because the Plaintiff did not retain and did not regain title to the Sold Goods by virtue of its legally ineffective stoppage notices, the Plaintiff does not have superior rights in the Sold Goods vis-a-vis the Lenders.

(f)     Because the Plaintiff did not retain and did not regain title to or the right to possession of the Sold Goods by virtue of its legally ineffective stoppage notices, the Plaintiff does not have any claims of conversion against any of the Defendants with respect to the Sold Goods.

2.     Accordingly, the Court should enter an order holding that each of Count I, Count II, and Count III of the Complaint must fail because (a) the Sold Goods became and remained property of TSA's estate, (b) the Stop Shipment Notices (as defined below) were not effective, as a matter of law under Section 2-705 of the UCC, for the purpose of stopping the delivery of the Sold Goods to TSA, (c) the Plaintiff did not retain or regain title to or any possessory rights in the Sold Goods or the proceeds thereof, (d) the Lenders' rights in the Sold Goods and the proceeds thereof are superior to the rights of the Plaintiff therein, (e) the Plaintiff is not entitled to any accounting of the Sold Goods or the proceeds thereof from any of the Defendants, (f) none of the Defendants converted or exercised wrongful control over the Sold Goods or the proceeds thereof, and (g) the Plaintiff is not entitled to any damages from any of the Defendants on account of the Sold Goods or the proceeds thereof.

## II.     LEGAL STANDARD FOR SUMMARY JUDGMENT

3.     Federal Rule 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056, provides that "[t]he court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056.  "Summary judgment is designed

'to avoid trial or extensive discovery if facts are settled and dispute turns on issue of law.'"

*Burtch v. Detroit Forming, Inc. (In re Archway Cookies),* 435 B.R. 234, 238 (Bankr. D. Del.

2010) (citation omitted).

      4.     The moving party bears the initial burden of showing the absence of a genuine

issue of material fact as to an essential element of the nonmovant's case, identifying those

portions of the pleadings, depositions, interrogatories, and admissions on file together with

affidavits, if any, which it believes demonstrates the absence of genuine issues for trial.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  No genuine issue of material fact exists with respect

to a claim or claims "[w]here the record taken as a whole could not lead a rational trier of fact to

find for the nonmoving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986).

      5.     Once the moving party has met its burden, the burden shifts to the nonmoving

party to demonstrate the existence of a genuine issue of fact by providing sufficient evidence for

the ultimate trier of fact to find for the nonmovant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 258 (1986); *United States v. Jamas Day Care Ctr. Corp.*, 152 F. App'x 171, 173 (3d Cir.

2005) (citations omitted); *Leonard v. General Motors Corp. (In re Headquarters Dodge)*, 13

F.3d 674, 679 (3d Cir. 1993); *Burtch*, 435 B.R. at 239 (citations omitted).  "A material fact is one

which 'could alter the outcome' of the case."  *Burtch*, 435 B.R. at 239 (citations omitted).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48.  A material fact "is genuine when

it is 'triable,' that is, when reasonable minds could disagree on the result." *Burtch*, 435 B.R. at

239 (citations omitted).

6.      For the reasons set forth below, the Movants have met their burden in connection

with the Motion.  Accordingly, the Motion should be granted in its entirety.

### III.     UNDISPUTED FACTS

**A.      Sale of the Sold Goods by the Plaintiff to TSA**

7.      Prior to the Petition Date, TSA purchased the Sold Goods from the Movant

pursuant to the 2015 Import Vendor Deal Sheet Summary attached to the Complaint as Exhibit B

(the "Vendor Deal Sheet").  *See* Complaint ¶ 13 & Ex. B;   The Sold Goods are collectively

described in the ten (10) invoices attached to the Complaint as Exhibit A (collectively, the

"Vendor Invoices").  *See* Complaint ¶ 13 & Ex. A.

8.      As noted in *TSA Stores, Inc.'s Answer to the Complaint by O2Cool, LLC* [Adv.

Proc. D.I. 20] ("TSA's Answer"), TSA admitted that it purchased the Sold Goods from the

Plaintiff but disputed the total amount of the goods listed in the Vendor Invoices because TSA

was shorted goods in the aggregate amount of approximately $7,740.  *See TSA's Answer* ¶ 7.

For the purpose of this Motion, the goods that were sold by the Plaintiff to TSA and were

actually received by TSA are referred to herein as the "Sold Goods."

9.      The Vendor Deal Sheet indicates that the Plaintiff would charge "F.O.B. pricing."

*See* Vendor Deal Sheet at 1.  The Vendor Deal Sheet also states that the Plaintiff "shall adhere to

the invoice and shipping policies, as well as the terms and conditions of TSA's Vendor

Relationship Guide which is . . . incorporated by reference."  *See* Vendor Deal Sheet at 2.

Section 8 of TSA's Vendor Relationship Guide (the "Vendor Guide"), attached as Exhibit 1 to

the *Declaration of Stephen Binkley in Support of the Debtors' Omnibus Reply in Support of*

*Entry of Final Orders on Certain First Day Motions* (the "Binkley Declaration") [Main Case D.I. 995], provides that title to goods sold by a vendor pursuant to an F.O.B. origin order is transferred to TSA upon such vendor's delivery of the goods to TSA's designated carrier.  *See* Vendor Guide § 8, ¶ 4.  Section 8 of the Vendor Guide specifically provides that "[f]or F.O.B. origin Orders, title and risk of loss shall remain with Vendor **until the Merchandise is received by the carrier** designated by SPORTS AUTHORITY."  *Id.* (emphasis added).  Accordingly, title and risk of loss pass from the Plaintiff to TSA upon delivery of goods sold to TSA's designated carrier.

10.     The Sold Goods originated in China and were destined for TSA's distribution centers located in (a) Denver, Colorado, (b) McDonough, Georgia, (c) Fontana, California, (d) Burlington, New Jersey, and (e) Romeoville, Illinois (collectively, the "Distribution Centers"), as indicated on the Vendor Invoices.  *See* Vendor Invoices; *see also* Complaint ¶ 14; TSA's Answer ¶ 8.

**B.     Transportation of the Sold Goods to the Distribution Centers**

*1.     Yusen's Role in the Transportation of the Sold Goods*

11.     Yusen provides logistics and supply chain management services including air freight forwarding, ocean freight forwarding, origin cargo management, customs house brokerage, warehousing, and over the road and intermodal transportation to a wide range of industries.  *See* Marotta Declaration ¶ 3.  Yusen is a New York corporation with its corporate headquarters in Secaucus, New Jersey.  Yusen is owned by Yusen Logistics Co. Ltd, ("YLK") a Japanese corporation.  Through its subsidiaries, YLK operates a global logistics and supply chain services network linking Asia, the Americas, Europe, Africa and Oceania.  *See id.*

12.     Yusen performed origin cargo management and customs house brokerage services for TSA.  *See id.* ¶ 4.  As part of these services, Yusen provided TSA with cargo management system and software (the "Cargo Management System") and a dedicated account manager.  *See id.*  TSA implemented standard operating procedures with which Yusen was required to comply, and as part of these procedures, TSA selected and approved all carriers and provided routing guidelines for all shipments (the "TSA Shipping Guidelines").  *See id.*  TSA's vendors, including the Plaintiff, had access to the Cargo Management System.  *See id.* ¶ 5.  When a vendor had a shipment prepared for transportation to TSA, such vendor would notify TSA and Yusen of the impending shipment by entering a booking entry in the Cargo Management System.  *See id.*

13.     As discussed below, Yusen's role in the transportation of the Sold Goods was as a customs house broker for TSA once the Sold Goods arrived at the respective U.S. ports.  *See id.* ¶¶ 12 n. 2, 13.

### 2.     *Role of Yusen's Affiliates in the Transportation of the Sold Goods*

14.     With respect to the Sold Goods, TSA hired Yusen Logistics (Hong Kong) Inc. ("YL Hong Kong") as a freight forwarder to receive the Sold Goods from the Plaintiff and to arrange for the transportation of the Sold Goods from China to the Distribution Centers, in accordance with the TSA Shipping Guidelines.  *See id.* ¶¶ 6, 12 n. 2.

15.     TSA also hired Shenzhen Yusen Freight Service Company Limited – OCM ("Shenzhen") to consolidate the Sold Goods into shipping containers at the port of departure in China and deliver them to the designated carriers.  *See id.*

### 3.     *Delivery of the Sold Goods to Shenzhen*

16.     The Plaintiff delivered the Sold Goods to Shenzhen.  *See* Vendor Shipping Documents; Marotta Declaration ¶ 7.  All of the Sold Goods were delivered by the Plaintiff to

Shenzhen between and including January 13, 2016 and February 3, 2016, as evidenced by the commercial invoices and packing lists, attached as Exhibit 1 to the Marotta Declaration (collectively, the "Vendor Shipping Documents"), signed and dated by the Plaintiff and provided to YL Hong Kong with the respective Sold Goods. *See id.*

17.    Each set of the Vendor Shipping Documents provides the following information: (i) that the Plaintiff delivered the Sold Goods "FOB Yantian China," (ii) details about the specific Sold Goods contained in the specific shipmen, (iii) the vessel that was to transport the listed Sold Goods, (iv) the place of departure, (v) the date of departure, and (vi) the place of arrival. *See* Vendor Shipping Documents; Marotta Declaration ¶ 8.   Additionally, the O2Cool Shipping Documents list the Plaintiff as the seller, TSA as the consignee and the buyer, and Yusen as TSA's broker. *See id.*

18.    Upon receipt of the Sold Goods, YL Hong Kong issued forwarder's cargo receipts, attached as Exhibit 2 to the Marotta Declaration (collectively, the "Forwarder's Cargo Receipts"). *See* Forwarder's Cargo Receipts; Marotta Declaration ¶ 7.[2]

### 4.    *Delivery of the Sold Goods to the Transporting Carriers*

19.    Once the Sold Goods were delivered to Shenzhen, Shenzhen then consolidated and delivered the Sold Goods to the designated carriers (collectively, the "Transporting Carriers"). Marotta Declaration ¶ 7.  Upon receipt, the Transporting Carriers issued non-negotiable sea waybills or bills of lading, attached as Exhibit 3 to the Marotta Declaration (collectively, the "Carrier Waybills"). *See* Carrier Waybills; Marotta Declaration ¶ 7.

---

[2]    The Forwarder's Cargo Receipts are also attached to the Complaint as Exhibit D.

20.    Each of the Carrier Waybills provides the following information:  (i) a summary of the specific Sold Goods in the corresponding Vendor Shipping Documents and the Forwarder's Cargo Receipts, (ii) the name of the Transporting Carrier, (iii) the name of the vessel and voyage number, (iv) the port of loading, (v) the port of discharge, and (vi) the place of delivery (i.e., the city of one of the Distribution Centers).  *See* Carrier Waybills; Marotta Declaration ¶ 9.  Additionally, the Carrier Waybills list Shenzhen as the shipper, TSA as the consignee, and Yusen as the notice party.  *See id.*  The Plaintiff, however, is not named in the Carrier Waybills as the person from which the Sold Goods were received by the Transporting Carrier for shipment.  *See* Carrier Waybills.

21.    Neither YL Hong Kong nor Shenzhen retained possession of any of the Sold Goods after the Sold Goods were delivered to the carriers.  Marotta Declaration ¶ 14.

22.    A report generated by the Cargo Management System on February 18, 2016 and attached as Exhibit 4 to the Marotta Declaration (the "Cargo Report") indicates, among other things, (i) the date on which each shipment of Sold Goods was loaded on the respective Transporting Carrier at the port in Yantian, China and (ii) the date on which the Transporting Carrier's vessel carrying each shipment actually set sail from such port.  *See* Cargo Report; Marotta Declaration ¶ 11.

### *5.    OOCL's Role in the Transportation of the Sold Goods*

23.    OOCL is an agent for a disclosed principal, Orient Overseas Container Line Limited ("Orient Overseas").  *See Answer, Affirmative Defenses, and Counterclaims of Defendant OOCL (USA), Inc. to the Complaint of O2Cool, LLC* [Adv. Proc. D.I. 29] ("OOCL's Answer") ¶ 15.  OOCL is not a carrier and did not transport any of the Sold Goods.  *See* OOCL's Answer ¶ 15.  Thus, OOCL is not a Transporting Carrier.

### 6.     *Role of Orient Overseas in the Transportation of the Sold Goods*

24.     As indicated in seven of the Carrier Waybills, Orient Overseas is listed as the carrier on such Carrier Waybills (such Carrier Waybills, the "Orient Overseas Waybills"), attached hereto as Exhibit A.[3]  *See* Carrier Waybills.  Pursuant to the Orient Overseas Waybills, Orient Overseas undertook the contractual obligation to transport the Sold Goods summarized therein to their respective places of delivery.  *See* Orient Overseas Waybills.  Each of the seven shipments with Sold Goods carried on Orient Overseas vessels departed from the port of loading in Yantian, China between and including February 1, 2016 and February 10, 2016.  *See* Cargo Report.  Thus, Orient Overseas is a Transporting Carrier.

### 7.     *Role of Other Carriers in the Transportation of the Sold Goods*

25.     With respect to the remaining three Carrier Waybills, Nippon Yusen Kaisha (NYK Line) ("NYK") is listed as the carrier on one such Carrier Waybills (such Carrier Waybill, the "NYK Waybill"), attached hereto as Exhibit B.[4]  *See* Carrier Waybills.  Pursuant to the NYK Waybill, NYK undertook the contractual obligation to transport the Sold Goods summarized therein to its respective place of delivery.  *See* NYK Waybill.  This shipment with Sold Goods carried on an NYK vessel departed from the port of loading in Yantian, China on January 26, 2016.  *See* Cargo Report.  Thus, NYK is a Transporting Carrier.

---

[3]   The Orient Overseas Waybills are included in the Carrier Waybills attached as Exhibit 3 to the Marotta Declaration, but they compose a separate exhibit attached hereto for the Court's convenience.

[4]   The NYK Waybill is included in the Carrier Waybills attached as Exhibit 3 to the Marotta Declaration, but it composes a separate exhibit attached hereto for the Court's convenience.

26.     CMA CGM S.A. ("CMA") is listed as the carrier on the remaining two Carrier Waybills (such Carrier Waybills, the "CMA Waybills"), attached hereto as Exhibit C.[5]  *See* Carrier Waybills.  Pursuant to the CMA Waybills, CMA undertook the contractual obligation to transport the Sold Goods summarized therein to their respective places of delivery.  *See* CMA Waybills.  These shipments with Sold Goods carried on CMA vessels departed from the port of loading in Yantian, China on January 21, 2016 and February 2, 2016.  *See* Cargo Report.  Thus, CMA is a Transporting Carrier.

### 8.     *Yusen's Role as Custom House Broker at U.S. Ports of Discharge*

27.     As noted above, Yusen served as TSA's customs house broker.  Marotta Declaration ¶¶ 12 n. 2, 13.  Once the Sold Goods arrived at the U.S. ports of discharge, Yusen filed the necessary paperwork to enable TSA to import the Sold Goods into the United States.  *See id.* ¶ 13.  However, at no time during this process or at any other time did Yusen have or take possession of the Sold Goods.  *See id.* ¶¶ 10, 13, 14.  At all times during this process the Sold Goods remained in the possession of the respective Transporting Carriers.  *See id.* ¶¶ 13, 14.  Yusen did not provide any transportation or warehouse services with respect to the Sold Goods.  *See id.* ¶ 13.  Instead, the respective Transporting Carriers were contractually obligated in accordance with the Carrier Waybills to deliver the Sold Goods to their corresponding places of delivery (i.e., the Distribution Centers).  *See* Carrier Waybills.

---

[5]     The CMA Waybills are included in the Carrier Waybills attached as Exhibit 3 to the Marotta Declaration, but they compose a separate exhibit attached hereto for the Court's convenience.  Please note that the CMA Waybill dated January 21, 2016 will be filed with a supplemental declaration.

C.      **Summary of the Shipment of the Sold Goods**

28.      A table summarizing the relevant transportation and shipment information respecting the Sold Goods corresponding to each of the Vendor Invoices is attached hereto as Exhibit D (the "Summary Table").  The Summary Table includes, among other things, (i) the corresponding purchase order numbers, (ii) the Commercial Invoice numbers, (iii) the Forwarder's Cargo Receipt numbers, (iv) the dates on which the Sold Goods were received by YL Hong Kong, (v) the dates on which the Carrier Waybills were issued by the Transporting Carriers upon receipt of the Sold Goods, (vi) the names of the Transporting Carrier, (vii) the names of the shipper listed on the Carrier Waybills, (viii) the dates on which the Transporting Carrier's vessels actually set sail, (ix) the place of delivery (i.e., one of the Distribution Centers), and (x) and the estimated dates on which each shipment of the Sold Goods was due to arrive at the place of delivery.

D.      **Delivery of the Sold Goods to TSA**

29.      All of the Sold Goods were ultimately delivered to TSA at the respective Distribution Centers.  *See* Complaint ¶ 23; TSA's Answer ¶¶ 17, 18.  TSA took possession of all Sold Goods, distributed the Sold Goods to various stores owned by TSA, sold all or substantially all of the Sold Goods to its customers, and remitted all or substantially all proceeds from the sale of the Sold Goods to one or more of the Lenders.  *See* TSA's Answer ¶¶ 14, 16, 17, 18.  Accordingly, TSA is no longer in possession of any Sold Goods or the proceeds thereof.  *See* TSA's Answer ¶¶ 17, 18.

E.      **The Plaintiff's Ineffective Stop Shipment Notices to Yusen**

30.      The Plaintiff sent certain stop shipment notices addressed to Yusen, attached to the Complaint as Exhibit D (collectively, the "Stop Shipment Notices") to Yusen.  *See*

Complaint ¶ 16 & Ex. D.  The Plaintiff sent the following five Stop Shipment Notices to Yusen dated:

(1) February 12, 2016
(2) February 15, 2016
(3) February 15, 2016
(4) February 25, 2016
(5) February 26, 2016

*See* Stop Shipment Notices.

31.     Yusen acknowledged receipt of the Stop Shipment Notices.  *See Answer to Yusen Logistics (Americas) Inc. to the Complaint of O2Cool, LLC* [Adv. Proc. D.I. 19] ("Yusen's Answer") ¶ 10.  In response to the Stop Shipment Notices, Yusen advised the Plaintiff that Yusen was only a freight forwarder and not a carrier or a bailee, and that it did not have possession of the Sold Goods.  *See* Marotta Declaration ¶ 12; Yusen's Answer ¶ 11; Complaint ¶ 17.  As noted above, at no time did Yusen have possession of the Sold Goods.  *See* Marotta Declaration ¶¶ 10, 13, 14.

32.     Moreover, although they are each distinct legal entities separate from Yusen, neither YL Hong Kong nor Shenzhen had possession of the Sold Goods as of the dates of the Stop Shipment Notices given that the latest shipments of Sold Goods were on board the Carrier's vessels by no later than February 10, 2016, the date on which such vessels set sail.  *See* Summary Table; Cargo Report.  Therefore, all of the Sold Goods were in the possession of the Carriers and at sea before the Plaintiff sent the first Stop Shipment Notice to Yusen.  *See* Marotta Declaration ¶ 11.

**F.     The Plaintiff's Ineffective Stop Shipment Notices to OOCL**

33.     After being advised by Yusen that Yusen was not a carrier of the Sold Goods, the Plaintiff forwarded the Stop Shipment Notices to OOCL.  *See* Complaint ¶ 17; OOCL's Answer

¶ 17.  Each of the Stop Shipment Notices that the Plaintiff forwarded to OOCL were still addressed to Yusen.  *See* OOCL's Answer ¶ 17.  OOCL acknowledged receipt of the Stop Shipment Notices.  *See* Complaint ¶ 17; OOCL's Answer ¶ 17.  However, OOCL was not a carrier of the Sold Goods.  *See* OOCL's Answer ¶ 15.  Moreover, the Plaintiff was not named in any of the Carrier Waybills as the person from which the Sold Goods were received for shipment.  *See* Carrier Waybills.

### G.  The Plaintiff's Failure to Send Stop Shipment Notices to YL Hong Kong, Shenzhen, and the Transporting Carriers

34.  The Plaintiff did not send the Stop Shipment Notices, or any similar stoppage notices, to YL Hong Kong – the entity that issued the Forwarder's Cargo Receipts – or to Shenzhen – the entity that is listed as the shipper on the Carrier Waybills.

35.  The Plaintiff also did not send the Stop Shipment Notices, or any similar stoppage notices, to any of the Transporting Carriers – Orient Overseas, NYK, and/or CMA – that issued the respective Carrier Waybills.

### H.  The Plaintiff's Failure to Assert Any Reclamation Claims

36.  The Plaintiff did not assert any claims against TSA for reclamation, under Section 2-702 of the UCC or pursuant to section 546(c) of the Bankruptcy Code, with respect to any of the Sold Goods, at any time before or after the Petition Date.

### I.  The Plaintiff's Failure to Assert Any Administrative Expense Claims

37.  The Plaintiff did not assert any administrative claims, including claims pursuant to section 503(b)(9) of the Bankruptcy Code, with respect to any of the Sold Goods, at any time before or after the deadline to file such claims.

## IV.   __ARGUMENT__

**A.   TSA Acquired Title in the Sold Goods Under Sections 2-401 and 2-319 of the UCC as a Matter of Law**

38.     Title to the Sold Goods passed to TSA as a matter of law prior to the Petition Date.  Article 2 of the UCC governs the passage of title to goods as between a seller and a buyer. Section 2-401 of the UCC provides that "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties."  Del. Code Ann. tit. 6, § 2-401(1) (West).  Article 2 further provides that "[u]nless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . even though a document of title is to be delivered at a different time or place."  *Id.* § 2-401(2).

39.     When goods are to be shipped to the buyer, Section 2-319 of the UCC sets forth the seller's obligations and explains that "the term F.O.B. (which means "free on board") at a named place . . . is a delivery term" and "[w]hen the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in this article (section 4-2-504) and bear the expense and risk of putting them into the possession of the carrier."  *Id.* § 2-319(1)(a).

40.     In *Leggett & Platt, Inc. v. Ostrom*, 251 P.3d 1135, 1142-43 (Colo. App. 2010), for instance, the court considered and applied both Section 2-401 and Section 2-319 of the UCC to determine whether possession and title had passed from the seller to the buyer.  First, the court found that "the terms of the master vendor agreement, the bills of lading and invoices showed that all the sales transactions at issue in this case were actually 'F.O.B. Shipping Point,' which was [the seller's] loading dock in Thornton."  *Id.* at 1143.  Second, the court found that "it is undisputed that [the seller] delivered the goods at its loading dock in Thornton to common

14

carriers hired and paid for by [the buyer], which then transported the goods to predetermined destinations outside Thornton." *Id.* Based on these facts, the court concluded that "the F.O.B. term certainly shows that *possession of the goods*, if not also acquisition of title, transferred to [the buyer] at [the seller's] loading dock in Thornton." *Id.* (emphasis added). The court held that "*title to the goods passed* to [the buyer] when [the seller] completed its performance by delivering the goods at its loading dock in Thornton to common carriers hired and paid for by [the buyer]." *Id.* (emphasis added). *See also Virginia Kid Co. v. New Castle Leather Co.*, 89 A. 367, 368 (Del. Super. Ct. 1913) (title and risk of loss passed to buyer upon seller's delivery to common carrier where good was sold subject to F.O.B. destination terms).

41.       Here, there is no dispute that TSA purchased the Sold Goods from the Plaintiff pursuant to the Vendor Deal Sheet, which incorporates by reference the Vendor Guide. The Vendor Deal Sheet and the Vendor Guide provide that the Plaintiff and TSA agreed to F.O.B. origin shipping terms whereby title to the Sold Goods would pass to TSA upon the Plaintiff's delivery of the Sold Goods to TSA's designated carrier. It is undisputed that the Plaintiff delivered all of the Sold Goods to YL Hong Kong, the freight forwarder engaged and designated by TSA to receive the Sold Goods from the Plaintiff, in accordance with UCC § 2-319(1)(a). Pursuant to F.O.B. origin shipping terms, the Plaintiff therefore completed its performance upon delivery of the Sold Goods to YL Hong Kong pursuant to UCC § 2-401(2). There is no agreement between TSA and the Plaintiff pursuant to which the parties agreed to deviate from UCC § 2-401 to delay the passage of title to the Sold Goods. Therefore, title to the Sold Goods passed to TSA upon the Plaintiff's delivery of the Sold Goods to YL Hong Kong.

**B.      The Stop Shipment Notices Were Not Effective to Stop the Delivery of the Sold Goods Under Sections 2-702 and 2-705 of the UCC as a Matter of Law**

42.     Notwithstanding the passage of title, a seller nevertheless has the right under the UCC to stop the delivery of goods to the buyer while such goods are still in transit.  Section 2-702 of the UCC provides that "[w]here the seller discovers the buyer to be insolvent, he may refuse delivery except for cash, including payment for all goods theretofore delivered under the contract, and stop delivery under this article (section 4-2-705)."  Del. Code Ann. tit. 6, § 2-702(1).  Section 2-705 of the UCC, in turn, provides:

> The seller may stop delivery of goods in the possession of a *carrier or other bailee* when he discovers the buyer to be insolvent (Section 2-702), and *may stop delivery* of carload, truckload, planeload, or larger shipments of express or freight when the buyer repudiates or fails to make a payment due before delivery or if for any other reason the seller has a right to withhold or reclaim the goods.

*Id.* § 2-705(1) (emphasis added).

43.     To stop the delivery of goods, Section 2-705 provides that "the seller must so notify as to enable the bailee by reasonable diligence to prevent delivery of the goods."  *Id.* § 2-705(3)(a).  Section 2-705 further provides that "[a]fter such notification the bailee must hold and deliver the goods according to the directions of the seller but the seller is liable to the bailee for any ensuing charges or damages."  *Id.* § 2-705(3)(b).  However, Section 2-705 also provides that "[a] *carrier* who has issued a *non-negotiable* bill of lading is not obliged to obey a notification to stop received from a person *other than the consignor*."  *Id.* § 2-705(3)(d) (emphasis added).  Pursuant to Section 7-102, made applicable to Article 2 of the UCC by Section 2-103:  a "bailee" is defined as "a person that by a warehouse receipt, bill of lading, or other document of title acknowledges possession of goods and contracts to deliver them"; a "carrier" is defined as "a person that issues a bill of lading"; a "consignee" is defined as "a

16

person named in a bill of lading to which or to whose order the bill promises delivery"; and a "consignor" is defined as "a person *named in a bill of lading* as the person from which the goods have been received for shipment."  *Id.* §§ 2-103(3), 7-120.

44.     Here, the Stop Shipment Notices sent by the Plaintiff to Yusen and to OOCL were not effective to stop the delivery of the Sold Goods.  *First*, the Stop Shipment Notices to Yusen were not effective because Yusen was neither a *carrier* nor a *bailee* with respect to the Sold Goods.  It is undisputed that Yusen informed the Plaintiff that it was not a carrier or a bailee and did not have possession of any of the Sold Goods.  Indeed, all of the Sold Goods were already aboard the respective Carriers' vessels and had set sail from their port of origin in Yantian, China before the Plaintiff sent its earliest Stop Shipment Notice dated February 12, 2016.  Thus, Yusen did not have possession of any of the Sold Goods when the Plaintiff sent the Stop Shipment Notices to Yusen.  Moreover, the Carrier Waybills each obligated the respective Carriers to deliver the Sold Goods to TSA's designated Distribution Centers such that the Carriers maintained possession of such Sold Goods until delivery was complete.  Therefore, Yusen did not have possession of the Sold Goods at any time during the shipment or transportation of the Sold Goods.  Accordingly, the Stop Shipment Notices to Yusen were ineffective to stop delivery of the Sold Goods because Yusen at no time was a carrier or was in possession of the Sold Goods and was therefore not a proper recipient of such notices and is not liable to the Plaintiff as a matter of law.[6]

---

[6]   Notably, the Plaintiff *did not* send the Stop Shipment Notices, or any similar stoppage notices, to YL Hong Kong – the entity that issued the Forwarder's Cargo Receipts – or to Shenzhen – the entity that is listed as the shipper on the Carrier Waybills.  However, even if the Plaintiff had sent the Stop Shipment Notices to YL Hong Kong and/or Shenzhen, the Sold Goods were already aboard the respective Carriers' vessels and had set sail from their port of origin in Yantian, China before the date of the earliest Stop Shipment Notice – February 12, 2016.  Thus, neither YL Hong Kong nor Shenzhen had possession of any of the Sold Goods when the Plaintiff sent the Stop Shipment Notices to Yusen.

45.     *Second*, the Stop Shipment Notices to OOCL were ineffective because OOCL was not a *carrier* that transported any of the Sold Goods.  When the Plaintiff sent the Stop Shipment Notices (which were all *addressed to Yusen* and not to OOCL), all of the Sold Goods were already aboard the respective Transporting Carriers' vessels in transit to various U.S. ports.  However, as noted above, OOCL was not a carrier with respect to the Sold Goods.  The following entities were Transporting Carriers as indicated in the Carrier Waybills:  Orient Overseas, NYK, and CMA.  However, the Plaintiff did not send the Stop Shipment Notices to any of the Transporting Carriers.  It is indisputable that OOCL is not named as a carrier in any of the Carrier Waybills, Forwarder's Cargo Receipts, or Vendor Shipping Documents, and was therefore not a Transporting Carrier.  OOCL acted only as an agent for Orient Overseas.  Accordingly, the Stop Shipment Notices to OOCL were ineffective to stop delivery of the Sold Goods because OOCL at no time was a carrier of the Sold Goods and was therefore not a proper recipient of such notices as a matter of law.

46.     Moreover, even if OOCL was the proper recipient in its capacity as agent for Orient Overseas (which it is not), the Stop Shipment Notices would still be deemed ineffective because the Plaintiff was not a *consignor* named in any of the Carrier Waybills, including the Orient Overseas Waybills.  As defined in the UCC, a "consignor" is "a person *named in a bill of lading* as the person from which the goods have been received for shipment."  Each of the Carrier Waybills – including the Orient Overseas Waybills – lists Shenzhen as the "shipper" and describes Shenzhen as the party from whom the specified Sold Goods were received.  The Plaintiff, on the other hand, is not listed on any of the Carrier Waybills – including the Orient Overseas Waybills – as the party from whom any Sold Goods were received by the corresponding Transporting Carriers, including Orient Overseas.  Therefore, pursuant to Section

2-705(3)(d), because each of the Transporting Carriers had issued *non-negotiable bills of lading*, neither Orient Overseas (or OOCL acting in the capacity as its agent) nor any of the other Transporting Carriers were "obliged to obey" the Stop Shipment Notices from the Plaintiff – a person that is not a "consignor." Here, it is indisputable that the Carrier Waybills were non-negotiable – as indicated on the face of the Carrier Waybills – and that Shenzhen (and *not* the Plaintiff) was named as the shipper – the party from whom the Transporting Carrier received the Sold Goods. However, the Plaintiff did not send the Stop Shipment Notices to Shenzhen and did not send the Stop Shipment Notices, or any similar stoppage notices, to any of the Transporting Carriers – Orient Overseas, NYK, and/or CMA. Accordingly, where the Transporting Carriers arguably would have been obliged to obey a notification to stop shipment from Shenzhen, the Stop Shipment Notices from the Plaintiff were ineffective to stop delivery of the Sold Goods as a matter of law.

**C.    The Plaintiff's Right to Stop Delivery of the Sold Goods Expired After the Sold Goods Were Delivered to TSA and the Plaintiff Did Not Pursue Any Reclamation Remedies After the Sold Goods Were Delivered to TSA**

47.    The right of a seller to stop the delivery of goods is not enforceable after the buyer has received the goods. Del. Code Ann. tit. 6, § 2-705(2)(a) ("[T]he seller may stop delivery until . . . receipt of the goods by the buyer . . . ."). The Third Circuit has explained that "the right to stop delivery lasts only while the goods are 'in transit,' and that status ends 'when the goods arrive at their destination and are delivered to the buyer or to his representative who is not a mere intermediary or link in the transit.'" *Donegal Steel Foundry Co. v. Accurate Prod. Co.*, 516 F.2d 583, 590 (3d Cir. 1975) (citations omitted). *See also Butts v. Glendale Plywood Co.*, 710 F.2d 504, 506 (9th Cir. 1983) ("[T]he seller's right to stop transit is cut off once the goods are received by the buyer in any event."). This Court has similarly concluded that "[t]he right to

stop delivery of goods may be cut off by 'receipt of the goods by the buyer.'" *Cargill Inc. v.*

*Trico Steel Co., L.L.C. (In re Trico Steel Co., L.L.C.)*, 282 B.R. 318, 322-23 (Bankr. D. Del.

2002), *aff'd sub nom. Trico Steel Co., L.L.C. v. Cargill Inc. (In re Trico Steel Co., L.L.C., Inc.)*,

302 B.R. 489 (D. Del. 2003) (citations omitted).  In *Cargill*, the "[the seller] stopped delivery of

[a certain good] in transit *before delivery* to [the buyer]."  282 B.R. at 329 (emphasis added).

48.     However, after a buyer has received the goods at issue, the seller's right to stop

delivery ends and its right to reclaim arises.  The Third Circuit has explained that "under the

U.C.C., the right of reclamation—a different right than the right to stop goods in transit—takes

effect when the buyer 'receives' the goods." *Montello Oil Corp. v. Marin Motor Oil, Inc. (In re*

*Marin Motor Oil, Inc.),* 740 F.2d 220, 225 (3d Cir. 1984).  This Court has similarly held that

"[o]nce the buyer is in receipt of the goods, however, the seller's remedy is limited to a claim for

reclamation pursuant to section 7-202 of the UCC." *Memorandum Opinion*, *O2Cool, LLC v.*

*TSA Stores, Inc. (In re TSAWD Holdings, Inc.,),* Case No. 16-51014-MFW (Bankr. D. Del. Mar.

1, 2017) at 13.

49.     Here, there is no dispute that TSA actually received the Sold Goods.  TSA has

admitted that the Sold Goods were all delivered to the Distribution Centers and TSA took actual,

physical possession of the Sold Goods at the time of delivery.  Upon delivery, the Plaintiff's

right to stop delivery of the Sold Goods pursuant to Section 2-705 of the UCC was extinguished

and the Seller's remedy was limited to a claim for reclamation.

50.     However, a reclamation claim is not self-executing.  *In re Waccamaw's*

*HomePlace*, 298 B.R. 233, 238 (Bankr. D. Del. 2003) ("[R]eclamation is not a self-executing

remedy.") (citation omitted) (internal quotation marks omitted).  To establish a reclamation claim

under either Section 2-702(2) of the UCC – or under section 546(c) of the Bankruptcy Code after

the buyer files for bankruptcy protection – the seller must establish that (a) the buyer/debtor was insolvent when the goods were delivered, (b) the seller made a timely written demand for the goods, (c) the goods were identifiable at the time of demand, and (d) the goods were in the possession of the buyer/debtor at the time of demand.  *See* Del. Code Ann. tit. 6, § 2-702(2); *In re Reichold Holdings US, Inc.,* 556 B.R. 107, 110 (Bankr. D. Del. 2016) ("Section 546(c) recognizes a vendor's right of reclamation for goods sold to a debtor.").  To make a timely reclamation claim, Section 2-702(2) requires the seller to make a reclamation demand within ten days of the buyer's receipt of the goods.  Del. Code Ann. tit. 6, § 2-702(2).  Under section 546(c) of the Bankruptcy Code, the seller must make a reclamation demand not later than 45 days of the debtor's receipt of the goods or not later than 20 days following the debtor's petition date if the 45-day period expires post-petition."  11 U.S.C. § 546(c)(1).  However, a seller's reclamation claim "is subject to the rights of a buyer in ordinary course or other good faith purchaser or lien creditor."  Del. Code Ann. tit. 6, § 2-702(3).

51.     Here, the Plaintiff did not assert any reclamation claims, either before or after the Petition Date.  The failure to do so is fatal to the Plaintiff's belated effort to seek what is effectively a reclamation remedy in the Complaint.  However, the Plaintiff's reclamation remedies have long expired, and moreover, TSA has admitted that it is no longer in possession of the Sold Goods or any proceeds thereof.

**D.     The Defendants Are Entitled to Summary Judgment on Count I of the Complaint Because the Sold Goods Became Property of TSA's Estate and the Plaintiff Did Not Regain Title in the Sold Goods via the Stop Shipment Notices**

52.     The Defendants are entitled to summary judgment on Count I because all of the Sold Goods became and remained property of TSA's estate.  Section 541 of the Bankruptcy Code provides that a debtor's estate includes, among other things, (i) "all legal or equitable

interests of the debtor in property as of the commencement of the case" and (ii) "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(1), (7). The Third Circuit has explained that "Section 541(a) was intended to sweep broadly to include all kinds of property, including tangible or intangible property." *In re Kane*, 628 F.3d 631, 637 (3d Cir. 2010). "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir. 2006) (quoting *Segal v. Rochelle*, 382 U.S. 375, 379 (1966)) (internal quotation marks omitted) ("It is also well established that the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code.").

53.    Property interests are largely defined by state law because "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *In re Majestic Star Casino, LLC,* 716 F.3d 736, 751 (3d Cir. 2013) (quoting *Butner v. United States*, 440 U.S. 48, 54 (1979)) (internal quotation marks omitted). *See also Butner*, 440 U.S. at 55 ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

54.    Here, as discussed above, TSA acquired title to the Sold Goods, in accordance with section 2-401 of UCC, as soon as the Plaintiff delivered the Sold Goods to YL Hong Kong, TSA's designated freight forwarder. As summarized in the Summary Table, all of the Sold Goods were delivered by the Plaintiff to YL Hong Kong before the Petition Date, between and including January 13, 2016 and January 30, 2016.

55.     Thereafter, TSA took physical possession of the Sold Goods upon their delivery to the Distribution Centers.  As summarized in the Summary Table, five of the shipments with Sold Goods arrived in the Distribution Centers before the Petition Date, between and including February 8, 2016 and March 1, 2016.  The remaining five shipments with Sold Goods arrived in the Distribution Centers after the Petition Date, between and including March 3, 2016 and March 11, 2016.  In accordance with section 541(a)(1) and (7) of the Bankruptcy Code, TSA acquired possessory interests in the Sold Goods that were delivered before and after the Petition Date.

56.     The Plaintiff's allegation that the Sold Goods did not become property of TSA's estate is predicated entirely on the assertion that the Plaintiff delivered effective stoppage notices to stop the delivery of the Sold Goods.  However, for all of the reasons discussed above, the Stop Shipment Notices sent by the Plaintiff to Yusen and to OOCL were not effective – as a matter of law – to stop the delivery of the Sold Goods.  Therefore, the Sold Goods did indeed become – and remained – property of  TSA's estate notwithstanding the Stop Shipment Notices. Accordingly, the Plaintiff cannot prevail on Count I of the Complaint.

**E.      The Defendants Are Entitled to Summary Judgment on Count II of the Complaint Because the Plaintiff Did Not Regain Any Rights in the Sold Goods via the Stop Shipment Notices That Are Superior to the Lenders' Rights in the Sold Goods**

57.     The Defendants are also entitled to summary judgment on Count II because the Stop Shipment Notices were ineffective as a matter of law.  For all of the reasons discussed above, the Stop Shipment Notices sent by the Plaintiff to Yusen and to OOCL were not effective for the purpose of stopping the delivery of the Sold Goods.  Therefore, title to the Sold Goods did not revert to the Plaintiff on account of the Stop Shipment Notices and the Plaintiff did not regain rights in the Sold Goods that are superior to the rights of the Lenders.

58.    This Court has held that "the right to stop delivery is . . . not designated as a 'security interest' under Article 2 and, therefore, is not subject to Article 9." *Cargill*, 282 B.R. at 328.  In *Cargill*, this Court found that the delivery of the goods at issue was in fact stopped and "never came into the physical possession of [the buyer/debtor]." *Id.* at 324.  Under those facts, this Court held that the "[seller's] right to stop delivery . . . is superior to the rights of . . . a secured creditor of [the buyer/debtor]." *Id.* at 330.

59.    The Plaintiff relies on *Cargill* in support of its allegation that its rights in the Sold Goods are superior to the rights of the Lenders. *See Response to Term Loan Agent's Motion to Dismiss O2Cool, LLC's Complaint, O2Cool, LLC v. TSA Stores, Inc. (In re TSAWD Holdings, Inc.,)*, Case No. 16-51014-MFW (Bankr. D. Del. Oct. 11, 2016) ¶ 8 ("O2Cool did, in fact, exercise its UCC stoppage rights by sending the Stoppage Notices before the Stopped Goods were delivered (i.e., in the Debtors' physical possession).").  Moreover, this Court has held that the Plaintiff's superior rights vis-a-vis the Lenders are predicated on the assumption that the Plaintiff "properly exercised its stoppage rights pursuant to section 2-705 of the UCC while the [Sold Goods] were in transit . . . ." *see Memorandum Opinion*, *O2Cool, LLC v. TSA Stores, Inc. (In re TSAWD Holdings, Inc.,)*, Case No. 16-51014-MFW (Bankr. D. Del. Mar. 1, 2017) at 15.  However, the critical distinction between the facts in *Cargill* and the facts in this case is that, unlike *Cargill*, the Stop Shipment Notices in the instant case were not effective – as a matter of law pursuant to Section 2-705 of the UCC – to stop the delivery of the Sold Goods.  Therefore, the Plaintiff did not regain title in the Sold Goods and therefore does not have superior rights in the Sold Goods vis-a-vis the Lenders.  Accordingly, the Plaintiff cannot prevail on Count II of the Complaint.

**F.    The Defendants Are Entitled to Summary Judgment on Count III of the Complaint Because the Plaintiff Did Not Regain Title to the Sold Goods via the Stop Shipment Notices Such That None of the Defendants Exercised Are Liable to the Plaintiff**

60.     Finally, the Defendants are entitled to summary judgment on Count III because the Stop Shipment Notices were ineffective as a matter of law such that the Plaintiff did not acquire the right to possession of the Sold Goods or the proceeds thereof.

61.     The Plaintiff's allegation that any of the Defendants exercised wrongful control over the Sold Goods and/or the proceeds thereof is also predicated entirely on the assertion that the Plaintiff delivered effective stoppage notices to stop the delivery of the Sold Goods. However, for all of the reasons discussed above, the Stop Shipment Notices sent by the Plaintiff to Yusen and to OOCL were not effective – as a matter of law under section 2-705 of the UCC – to stop the delivery of the Sold Goods.  As discussed above, neither Yusen nor OOCL were proper recipients of the Stop Shipment Notices.  Additionally, in the event that it were deemed to be a proper recipient, OOCL (acting either on behalf of itself or in its capacity as agent for Orient Overseas) would have been well with its rights under section 2-705 of the UCC to disregard the Stop Shipment Notices from the Plaintiff and deliver the Sold Goods to TSA in accordance with the Orient Overseas Waybills and the applicable provisions of the UCC.  For these reasons and all other reasons discussed previously, the Stop Shipment Notices were not effective for the purpose of stopping the delivery of the Sold Goods.

62.     Given that the Stop Shipment Notices did not effectuate the transfer of title to the Sold Goods back to the Plaintiff, no right to possession of the Sold Goods was created in the Plaintiff on account of the Stop Shipment Notices.  Therefore, none of the Defendants could have converted or exercised wrongful control over the Sold Goods and/or the proceeds thereof vis-a-vis the Plaintiff.  Accordingly, none of the Defendants, including the Movants, are liable to the Plaintiff for any damages, and the Plaintiff cannot prevail on Count III of the Complaint.

## V.   CONCLUSION

For all of the foregoing reasons, the Movants respectfully request that the Court grant the

Motion by granting summary judgment in favor of the Defendants on Count I, Count II, and

Count III, dismiss the Complaint in its entirety, and grant such other and further relief as is just

and necessary.

Dated:  March 14, 2017                   YOUNG CONAWAY STARGATT & TAYLOR, LLP

Wilmington, Delaware                     /s/ *Andrew L. Magaziner*
                                         Michael R. Nestor (No. 3526)
                                         Andrew L. Magaziner (No. 5426)
                                         Michael S. Neiburg (No. 5275)
                                         Rodney Square
                                         1000 North King Street
                                         Wilmington, DE 19801
                                         Telephone:    (302) 571-6600
                                         Facsimile:    (302) 571-1253
                                         Email:        mnestor@ycst.com
                                                       amagaziner@ycst.com

                                         -and-

                                         GIBSON, DUNN & CRUTCHER LLP
                                         Robert A. Klyman
                                         Sabina Jacobs
                                         333 South Grand Avenue
                                         Los Angeles, CA 90071
                                         Telephone:    (213) 229-7000
                                         Facsimile:    (213) 229-7520
                                         Email:        rklyman@gibsondunn.com
                                                       sjacobs@gibsondunn.com

                                         *Counsel for TSA Stores, Inc.*


                                         — and —


                                         COZEN O'CONNOR

                                         /s/ *Simon E. Fraser*
                                         Simon E. Fraser, Esq. (No. 5335)
                                         1201 North Market Street, Suite 1001

Wilmington, DE 19801
Telephone:    (302) 295-2011
Facsimile:    (302) 295-2013
Email:          sfraser@cozen.com

-and-

OLASOV & HOLLANDER LLP
Rachel L. Hollander
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone:    (646) 898-2078
Facsimile:    (212) 202-4840
Email:          rhollander@olasov.com

*Counsel for Yusen Logistics (Americas), Inc.*